**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

RUFUS JONES,

                    Plaintiff,

v.                                                        **DECISION & ORDER**
                                                          15-CV-6022

CAROLYN W. COLVIN,

                    Defendant.

_____

### Preliminary Statement

Plaintiff Rufus Jones brings this action pursuant to Titles II and XVI of the Social Security Act seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for disability insurance benefits and supplemental security income.    See  Complaint  (Docket  #  1). Presently before the Court are the parties' competing motions for judgment on the pleadings and for directed verdict pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.   See Docket ## 20, 26.

### Background and Procedural History

On May 2, 2012, plaintiff applied for disability insurance benefits and supplemental security income.   Administrative Record ("AR.") at 130—39.   In his application, he alleged a disability onset date of July 1, 2010.   Id.   On August 30, 2012, plaintiff received

a Notice of Disapproved Claim.   AR. at 87-94.   On September 24, 2012, plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ").   AR. at 95-96.   A hearing was held before ALJ Sandra D. Lord on May 1, 2013.   AR. at 31-66.   Plaintiff appeared *pro se* at the hearing, and Vocational Expert Debra J. Horton also testified.   Id.   On July 5, 2013, the ALJ issued a decision finding claimant not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act.   Id.   Plaintiff timely filed a request for review of the ALJ's decision by the Appeals Council.   AR. at 15.   On November 20, 2014, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the defendant Commissioner.   AR. at 1—6.   This federal lawsuit followed.

## Medical History

Plaintiff's treating physician is Dr. Walter Beecher, who plaintiff has seen for several decades.   AR. at 330-31.   During the relevant period in the instant case, plaintiff first saw Dr. Beecher on July 22, 2010 for his hypertension.   Id.   At the appointment, Dr. Beecher noted that plaintiff wore a wrist splint and took the following medications: Penicillin, Lisinopril once a day, Naproxen twice a day, Labetalol twice a day, and Verapamil twice a day.   Id. Dr. Beecher also noted that plaintiff was obese (weighing 231 pounds)

2

and had high blood pressure.  Id.  Dr. Beecher advised plaintiff to stop taking Lisinopril.  Id.

On December 8, 2010, plaintiff returned to Dr. Beecher's office for a sore throat.  AR. at 328.  At the appointment, Karen Snow-Holmes, a family nurse practitioner, noted that plaintiff was obese and a smoker.  Id.  FNP Snow-Holmes found that plaintiff was negative for strep throat and advised him to stop smoking and continue taking his hypertension medication.  Id.

On December 30, 2010, plaintiff saw Dr. Beecher for a blood pressure check, ear pain, and congestion.  AR. at 326.  Plaintiff told Dr. Beecher his wrist pain was improving but his hypertension was not.  Id.  Dr. Beecher noted that plaintiff was reluctant to increase his hypertension medication.  Id.

On March 3, 2011, plaintiff returned to Dr. Beecher for a follow-up appointment.  AR. at 324-25.  Dr. Beecher noted that plaintiff's blood pressure remained close to the same as it was during his last three appointments and told plaintiff that he would have to raise the dosage of his medication.  Id.

On March 24, 2011, plaintiff saw Dr. Beecher because his hypertension medication was causing him headaches.  AR. at 322.  Dr. Beecher noted that plaintiff "adamantly refuse[d]" to increase his medication.  Id.  Dr. Beecher also advised plaintiff to stop smoking cigarettes.  Id.

3

On August 10, 2011, plaintiff returned to Dr. Beecher for a blood pressure check. AR. at 319. Plaintiff saw Jessica Martin, a physician's assistant, and told her that he had been taking his medication and improving his diet and exercise. Id. Plaintiff complained of chest pain the week prior, but said that there had been no recurrences. Id. PA Martin noted that plaintiff's blood pressure was higher than desired but that plaintiff was unwilling to adjust his medication. Id. Instead, plaintiff expressed an interest in continuing to improve his health by losing weight through diet and exercise. Id. PA Martin advised plaintiff to continue taking his hypertension medication and referred him to a cardiologist to evaluate his reported chest pain. AR. at 319-20. Plaintiff also had an electrocardiogram test performed, and PA Martin noted that it revealed no acute changes. Id.

On October 25, 2011, plaintiff returned to Dr. Beecher for a follow-up appointment. AR. at 317. Plaintiff informed Dr. Beecher that he quit smoking, but wanted a substitute for his nicotine cravings. Id. Dr. Beecher advised plaintiff to continue taking his medication and made him agree to slowly increase his dosage. Id. Dr. Beecher also prescribed plaintiff a Nicotrol Inhaler. Id.

On December 6, 2011, plaintiff went to the walk-in care clinic at Unity Hospital for shortness of breath following a dental appointment at the same facility. AR. at 291-304. An x-ray of

4

plaintiff's chest showed a normal cardio-mediastinal silhouette and clear lungs. AR. at 292. He presented with some wheezing, but his respiratory profile was otherwise normal. AR. at 303. An electrocardiogram test showed sinus bradycardia and left ventricular hypertrophy ("LVH") with T-wave inversion and normal intervals. AR. at 304, 344. The practitioners at Unity Hospital wanted to hold plaintiff for further evaluation but plaintiff refused because he feared he would miss class the following day. Id. Instead, plaintiff opted for a follow-up appointment with Dr. Beecher. Id.

On December 21, 2011, plaintiff visited Dr. Beecher for a follow-up appointment related to the shortness of breath from two weeks earlier. AR. at 314. Plaintiff reported that the symptoms resolved themselves on their own, and that he did not experience irregular heart beating while exercising or climbing stairs. Id. Plaintiff also reported wheezing in his chest while supine and expressed concern over lung disease. Id. Dr. Beecher noted that plaintiff appeared alert and oriented, presented no heart murmurs, and had clear lungs free of wheezes. Id. Dr. Beecher also noted that, per the electrocardiogram taken at Unity Hospital, plaintiff's heart appeared irregular and presented palpitations. AR. at 314-15. Dr. Beecher referred plaintiff to Clinical Group Cardiology for his uncontrolled hypertension and recent heart palpitations. AR. at 315. He also prescribed plaintiff a new medication for

hypertension, Cozaar, and noted that plaintiff's blood pressure remained elevated. Id. Dr. Beecher advised plaintiff to continue dieting and exercise, and to stop smoking. Id.

On January 20, 2012, plaintiff visited Dr. Beecher. AR. at 312. Dr. Beecher reported that plaintiff's blood pressure had gone down with his new medication, but noted that plaintiff had not seen the cardiologist. Id. He also noted that plaintiff emphatically announced that he had quit smoking and that plaintiff requested a urine drug screen to present to a counselor. Id.

On April 19, 2012, plaintiff had an appointment with Dr. Beecher to check his medication and address back pain and bilateral ankle swelling. AR. at 309. Dr. Beecher noted that plaintiff presented mild ankle edema but was otherwise in no acute distress. Id. At this appointment, plaintiff told the nurse that, on a scale of one to ten, his back pain was an eight in severity and that walking exacerbated the pain. AR. at 310. Dr. Beecher also commented that plaintiff's blood pressure was slightly higher, and advised plaintiff to eat healthily and lower his salt intake. Id.

On August 8, 2012, plaintiff had a follow-up appointment with Dr. Beecher. AR. at 307. Plaintiff complained of left-side chest pain – which he claimed began in 2011 – and shortness of breath. Id. He informed Dr. Beecher that he needed a note excusing him from work because he had been experiencing a great deal of stress. Id. Dr.

6

Beecher noted that plaintiff's blood pressure was better, but not at the goal set for him.   Id.   Dr. Beecher also noted that plaintiff's electrocardiogram showed LVH.   Id.   As a result, Dr. Beecher urged plaintiff to increase his hypertension medication, and advised plaintiff to remain out of work for three months.   AR. at 308.   Dr. Beecher also urged plaintiff to reduce his sodium intake and consult with a clinical pharmacist to address his diet and weight (he weighed 268 pounds).   AR. at 307-08.

On August 14, 2012, the Division of Disability Determination referred plaintiff to Dr. Harbinder Toor for an examination.   AR. at 337.   At the examination, plaintiff's chief complaints were asthma and shortness of breath, obesity, a history of intermittent temporary chest pain (last occurring in July 2012 and lasting twenty minutes), and chronic hypertension.   Id.   Plaintiff denied any history of diabetes, heart attack, heart disease, emphysema, or seizures.   Id.   Plaintiff also reported that he had smoked cigarettes since 1975 and, at the time of the appointment, was smoking four cigarettes per day.   Id.   He told Dr. Toor that he drank alcohol and used marijuana and cocaine, but had quit a few weeks prior to the appointment.   AR. at 337-38.   With respect to this daily life, plaintiff informed Dr. Toor that he cooked, cleaned, did laundry, and shopped.   AR. at 338.   He reported that he showered and dressed himself daily and watched television, listened to the radio, and

7

read.   Id.   Plaintiff reported no socialization, exercise, or hobbies.   Id.   Dr. Toor noted that plaintiff was obese (weighing 266 pounds), but did not appear to be in acute distress.   Id.   He also noted that plaintiff had a normal gait and could walk without difficulty or assistance.   Id.   According to Dr. Toor's report, plaintiff was able to change clothes for the examination and get on and off of the examination table without difficulty.   Id.   Dr. Toor also noted that plaintiff had: a regular heart rhythm; full flexion of the spine; and full range of motion in the shoulders, elbows, hips, knees, and ankles.   Id.   At the appointment's end, Dr. Toor diagnosed plaintiff with asthma, hypertension, intermittent chest pain, difficult breathing, obesity, and intermittent edema in the legs, but determined that his prognosis was fair.   AR. at 340.   Dr. Toor remarked that plaintiff had mild limitations exerting himself, walking and standing for long periods of time, and lifting objects due to the pain in his chest.   Id.   He also determined that plaintiff should avoid irritants that could exacerbate his difficulties with breathing.   Id.

On August 23, 2012, plaintiff returned to Dr. Beecher's office, where Jennifer Rose, a family nurse practitioner, checked his blood pressure and provided medication adherence counseling.   AR. at 355. At the appointment, plaintiff reported mild shortness of breath. AR. at 386.   FNP Rose noted that plaintiff claimed to adhere to his

8

medication regimen, but that she could not confirm this. AR. at 355. She also remarked that plaintiff did not exercise or follow a diet, but expressed a desire to start. Id. According to FNP Rose's examination, plaintiff appeared normal and expressed interest in pursuing non-pharmaceutical approaches to treating his hypertension. AR. at 355, 386. FNP Rose advised him to continue taking his medication and to modify his diet and exercise. AR. at 355. She provided him with a food log to use in developing his diet plan with his doctors. Id.

On August 30, 2012, plaintiff saw Dr. Beecher. AR. at 357. At this appointment, plaintiff insisted that he was unable to work. Id. He informed Dr. Beecher that he was last employed two years before the appointment, and that he needed Dr. Beecher to complete forms for the Department of Social Services. Id. On examination, Dr. Beecher noted that plaintiff presented no acute distress, but appeared argumentative and had an elevated blood pressure. Id. Plaintiff was instructed to bring his food log but failed to do so. AR. at 382. Plaintiff told Dr. Beecher that he had been skipping meals to expedite his weight loss, and Dr. Beecher discouraged him from doing so. Id. Dr. Beecher also noted that plaintiff's blood pressure was "clearly not consistently controlled," and remarked that plaintiff had been advised to improve his diet, exercise, and adhere to his medication. AR. at 357. Dr. Beecher instructed

9

plaintiff to continue taking his hypertension medication and return in a week with his food log.  AR. at 382.

On September 6, 2012, plaintiff returned to Dr. Beecher's office for his diet and exercise follow-up consultation.  AR. at 380. Plaintiff was seen by Asim Abu-Baker, who noted that plaintiff again forgot to bring his food log and rescheduled a follow-up appointment for October 2012.  Id.

On October 11, 2012, plaintiff again returned to Dr. Beecher's office for a diet and exercise consultation.  AR. at 378.  According to the record, Dr. Beecher recommended that plaintiff have a colonoscopy and referred him to a gastroenterologist.  Id.

On December 5, 2012, plaintiff saw Dr. Beecher for a blood pressure check.  AR. at 376.  Plaintiff informed Dr. Beecher that he was feeling well but was unable to lose weight.  Id.  He said he was still stressed, but Dr. Beecher noted that he presented without acute distress and appeared calmer.  Id.  Dr. Beecher advised defendant to continue monitoring his blood pressure and avoid salty, fatty, and sugary foods and drinks.  AR. at 376-77.

On March 15, 2013, plaintiff had an appointment with Dr. Beecher.  AR. at 359.  At the appointment, plaintiff said that he thought his blood pressure was high today because he had a "big salty breakfast."  Id.  Dr. Beecher noted that plaintiff's blood pressure appeared uncontrolled, and advised him to continue taking his

10

medication and focus on improving his diet. Id.

On April 30, 2013, plaintiff underwent an electrocardiogram at Unity Hospital after reporting chest pain. AR. at 343. The electrocardiogram showed possible left atrial enlargement, and LVH with repolarization abnormality. Id. The reviewing physician noted that there had been no changes to plaintiff's condition since the electrocardiogram he had taken in December 2011. AR. at 343-44.

On May 22, 2013, plaintiff visited Dr. Beecher to discuss his most recent electrocardiogram results. AR. at 372. Dr. Beecher noted that plaintiff's hypertension was benign but that he had pain in his leg. Id. Dr. Beecher also noted that plaintiff's blood pressure was not well-controlled on the day of the appointment and added a diuretic to plaintiff's medication regimen to treat his blood pressure and LVH. AR. at 372-73.

On June 5, 2013, the Division of Disability Determination referred plaintiff to Dr. Karl Eurenius for a consultative examination. AR. at 366. Plaintiff complained of high blood pressure, sciatic back pain, and chest pain. Id. He stated that the chest pain had lasted for two years and was especially painful when he exerted himself, and that he had left atrial enlargement. Id. Plaintiff also gave Dr. Eurenius his electrocardiogram, which showed LVH. Id. Dr. Eurenius noted that plaintiff had not been hospitalized and was not using nitroglycerin to treat his chest pain,

and remarked that his electrocardiogram showed "minimal" LVH.  Id.
With respect to his back pain, plaintiff stated that it had persisted
for seven or eight months and that the pain radiated into his right
leg and buttock.  Id.  Dr. Eurenius noted that plaintiff had gone
to physical therapy but that it was unhelpful.  Id.  Plaintiff had
not, Dr. Eurenius noted, had an MRI, had cortisone injections, or
consulted an orthopedic surgeon.  Id.  Dr. Eurenius also reported
that plaintiff smoked a pack of cigarettes per day, but denied
drinking alcohol or using drugs.  AR. at 366-67.  According to Dr.
Eurenius' examination, plaintiff cooked and cleaned once a week, did
laundry and shopped once a month, showered every other day, and
dressed himself and watched television daily.  AR. at 367.
Physically, Dr. Eurenius observed that plaintiff was mildly obese
(weighing 283 pounds) and appeared "brusk and . . . in a hurry to
leave."  Id.  Dr. Eurenius reported that plaintiff had a normal gait
and no difficulty walking unassisted or squatting fully.  Id.
Plaintiff had full flexion of the cervical and lumbar spine, and full
range of motion in his shoulders, elbows, hips, knees, and ankles.
Id.  Dr. Eurenius diagnosed plaintiff with chest pain of uncertain
etiology, back pain of uncertain etiology with neuropathic symptoms,
and well-controlled asthma.  Id.  More generally, Dr. Eurenius
described  plaintiff's  prognosis  as  stable.    AR.  at  368.
Consequently, Dr. Eurenius determined that plaintiff "is moderately

12

limited in exertional activities due to chest pain until the etiology is determined," and "mildly limited in bending, lifting, picking, or carrying due to chronic low back pain with neuropathic symptoms of right leg." Id.

Since the ALJ's July 5, 2013 decision denying plaintiff benefits, plaintiff has submitted additional evidence related to his medical condition. Specifically, plaintiff began corresponding with the Appeals Council on July 19, 2013. AR. at 286. The correspondence continued to March 19, 2014, and consisted largely of pharmacy records, explanations of previous medical records in plaintiff's own words, and printouts from various websites. AR. at 225-90. However, on April 8, 2014, plaintiff faxed to the Social Security Appeals Council a letter dated April 1, 2014 from Dr. Beecher. Plaintiff's Request Default Judgment (Docket # 18) at 7. In the letter, Dr. Beecher wrote that he believed plaintiff was currently unable to work in any capacity due to the pain in his left chest and shortness of breath. Id. Dr. Beecher also cited plaintiff's chronic obesity and historically uncontrolled hypertension, which Dr. Beecher believed led to the development of plaintiff's LVH. Id. Dr. Beecher also noted that, according to a "recent stress echo test" taken in December 2013 at Highland Hospital, plaintiff's LVH was moderate and his left atrial enlargement was mild. Id. Additionally, the test revealed that

13

plaintiff had a limited exercise tolerance due to deconditioning. Id. at 28. Dr. Beecher also reported that plaintiff had recently complied with his medication regimen and was seeking to change his lifestyle to preserve his cardiovascular health. Id. at 7.

Plaintiff also included in his submissions before this Court evidence of a January 21, 2015 visit to Dr. Beecher's office, where nurse practitioner Ellen Volpe examined him. Attachment to Plaintiff's Request Default Judgment (Docket # 18-1) at 2. Plaintiff refilled his prescription and told NP Volpe that he felt optimistic about his condition. Id. NP Volpe noted that plaintiff reported chest pain and discussed efforts to continue controlling his blood pressure. Id.

Finally, plaintiff submitted a letter from Dr. Beecher dated March 16, 2015. Plaintiff's Request Default Judgment (Docket # 18) at 8. In this letter, Dr. Beecher reiterated his belief that plaintiff was unable to work due to pain on the left-side of his chest, shortness of breath, and, most recently, severe back pain that limited his ability to walk to less than half an hour. Id. Dr. Beecher noted that plaintiff had become more adept at controlling his chronic hypertension, but nevertheless developed LVH. Id. Dr. Beecher also noted that plaintiff had demonstrated mild renal decline and that he had referred plaintiff to a nephrologist. Id. Dr. Beecher concluded that plaintiff was unable to perform any

14

"competitive work."  Id.


## Hearing Testimony

Testimony of Plaintiff: Plaintiff appeared before ALJ Sandra D. Lord on May 1, 2013.  AR. at 31-66.  At that hearing, plaintiff appeared without representation and waived his right to counsel. AR. at 33-36.  Plaintiff testified that he was fired from his job on July 1, 2010 due to a wrist injury he suffered while working.  AR. at 46-47.  However, plaintiff testified that he did not apply for disability insurance benefits immediately after that because he was receiving unemployment benefits.  Id.  Plaintiff stated that, approximately one year prior to the hearing, he was seeking employment again but began experiencing more serious medical impairments that prompted him to apply for disability insurance benefits.[1]  AR. at 47.  More specifically, plaintiff testified that he began experiencing chest and back pains and was diagnosed with asthma.  AR. at 38-39.  Plaintiff also testified that he underwent an electrocardiogram test in May 2012 that revealed he suffered heart problems related to high blood pressure.  Id.  The back pain, plaintiff explained, was related to a pinched nerve in his spine that made it difficult for him to walk comfortably.  AR. at 45.

At the hearing, plaintiff testified about medical evidence in

---

[1] According to plaintiff's application for disability insurance benefits, his disabling condition began on July 1, 2010.  AR. at 130.

the record and also brought with him new medical evidence: namely, a copy of an electrocardiogram test that plaintiff underwent the day before the hearing. AR. at 37-40. Based on the new electrocardiogram test, plaintiff identified his heart problem as a "[l]eft ventricle hypertrophy with repolarization abnormality" and testified that his condition was worsening. AR. at 40. Plaintiff also testified that, at the same appointment, he was told he suffered from sciatic nerve damage. AR. at 53. Noting that plaintiff had not had a consultative examination conducted by a cardiologist, the ALJ stated that she wished to have plaintiff examined by a heart specialist in light of this additional medical evidence. AR. at 42. Plaintiff agreed and highlighted that, based on his recent medical records, he satisfied the Social Security Administration's listings for cardiovascular impairments. AR. at 43-44. Specifically, plaintiff pointed to the fact that the electrocardiogram revealed that his heart condition was worsening. AR. at 44-45.

Additionally, plaintiff explained that, due to these conditions and his smoking habit, he could not walk more than thirty feet or ascend a flight of stairs without becoming short of breath. AR. at 40-41. Plaintiff acknowledged that his smoking habit likely worsened - or even caused - his asthma, and that he is responsible for that ailment. AR. at 41. Plaintiff also acknowledged that he was comfortable and not short of breath when sitting down. AR. at

16

48. Plaintiff testified that he took medication for his high blood pressures and that it helped, but also expressed concern that the stress of employment would worsen his condition. AR. at 50. Plaintiff said that he did not drive because of unexplained issues with his driver's license, but received rides from his daughter and his brother. AR. at 52, 54. Plaintiff testified that he lived alone in an apartment, but that his son stayed with him on weekends. AR. at 53. On those weekends, plaintiff testified that they would often walk to the playground. He said that, on a typical day, he surfed the internet and that he can cook and do all household chores except mop the floor. AR. at 52-53. Plaintiff acknowledged that he was told to lose weight to improve his physical condition and testified that he had improved his diet and lost five pounds. AR. at 53-54.

Testimony of the Vocational Expert: During the hearing, Vocational Expert ("VE") Debra J. Horton also testified. After explaining her qualifications as a VE, Ms. Horton explained plaintiff's relevant past employment history as follows: a hospital cleaner, Dictionary of Occupational Titles ("DOT") number 323.687-010, medium strength, Specific Vocational Preparation ("SVP") of two; a fast food worker, DOT number 311.472-100, light strength, SVP of two; a dish washer, DOT number 318.687-100, medium strength, SVP of two; and a security guard, DOT number 372.667.034, light strength, SVP of three. AR. at 57.

17

Next, the ALJ posed hypotheticals for Ms. Horton to consider. In the first, the ALJ asked Ms. Horton to consider what available employment existed for an individual: (1) of the same age and with the same educational and vocational background as plaintiff; (2) who can perform light work; (3) who can never climb ramps, stairs, ladders, or scaffolds; (4) who can occasionally balance, stoop, kneel, and crouch but never crawl; (5) who can never be exposed to unprotected heights, dust, odors, fumes, pulmonary irritants, or extreme temperatures; (6) who can occasionally be exposed to moving mechanical parts; and (7) who can never operate a vehicle. AR. 57-58. In response, Ms. Horton said that such an individual could work as an office helper (DOT number 239.567-010, light strength, SVP of two, 2,200 jobs in New York and 80,000 in the national economy), a routing clerk (DOT number 222.687-022, light strength, SVP of two, 2,500 jobs in New York and 97,000 in the national economy), or a mail clerk (DOT number 209.687-026, light strength, SVP of two, 3,600 jobs in New York and 119,000 in the national economy). AR. at 57-58.

Next, the ALJ asked Ms. Horton to consider what employment existed for an individual: (1) with the same limitations as the individual in the first hypothetical; and (2) who can perform sedentary work. AR. at 59. In response, Ms. Horton said that such an individual could work as a document preparer (DOT number 249.587-018, sedentary strength, SVP of two, 900 jobs in New York

18

and 64,000 in the national economy), an addresser (DOT number 209.587-010, sedentary strength, SVP of two, 380 jobs in New York and 13,000 in the national economy), or a food and beverage order clerk (DOT number 209.567-014, sedentary strength, SVP of two, 2,000 jobs in New York and 100,000 jobs in the national economy). AR. at 59-60.

Ms. Horton then testified that all the jobs she listed had an SVP of one or two, meaning they could be learned by short demonstrations or simple written or verbal instructions. AR. at 63. As such, she testified that they would not require significant training or a college degree. Id.

## Determining Disability Under the Social Security Act

The Evaluation Process: The Social Security Act provides that a claimant will be deemed disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The determination of disability entails a five-step sequential evaluation process:

> 1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> 2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.
>
> 3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocations factors such as age, education, and work experience.
>
> 4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.
>
> 5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); see also 20 C.F.R. §§ 404.1520, 416.920. Plaintiff bears the burden of proving his case at steps one through four. At step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." Poupore v. Astrue, 566 F.3d 303,

306 (2d Cir. 2009) (per curiam) (noting that Commissioner "need not provide additional evidence of the claimant's residual functional capacity" at step five); see also 20 C.F.R. § 404.1560(c)(2).

The ALJ's Decision: In applying the five-step sequential evaluation, the ALJ made the following determinations. At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity since July 1, 2010, the alleged onset date of his disability. AR. at 21. At the second step, the ALJ found that plaintiff had severe heart disease, asthma, hypertension, shortness of breath, and obesity. Id. At the third step, the ALJ analyzed the medical evidence and found that plaintiff did not have an impairment that met or medically equaled the severity of one of the listed impairments in the regulations and, as a result, proceeded to assign plaintiff a residual functional capacity ("RFC"). AR. at 21-22. Accordingly, the ALJ moved to the fourth step, which required asking whether plaintiff had the RFC to perform his past work, notwithstanding his severe impairments. The ALJ concluded that plaintiff had the RFC to perform light work, except that "he can never climb ramps, stairs, ladders, or scaffolds"; "can occasionally balance, stoop, kneel, and crouch, but never crawl"; "can never be exposed to unprotected heights"; "can occasionally be exposed to moving mechanical parts"; "can never operate a motor vehicle"; "can never be exposed to dust, odors, fumes, pulmonary irritants, extreme

21

cold, or extreme heat"; "is limited to simple, routine, repetitive tasks, but not at an assembly line pace"; and "is limited to simple work-related decisions." AR. at 22-24. Based on the RFC, the ALJ determined that plaintiff could not perform his past relevant work. AR. at 24.

Because plaintiff was unable to perform his past work, the ALJ proceeded to the fifth step, which is comprised of two parts. First, the ALJ assessed plaintiff's job qualifications by considering his physical ability, age, education, and previous work experience. Id. The ALJ next determined whether jobs exist in the national economy that a person having plaintiff's qualifications and RFC could perform. Id.; see also 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 404.1520(f), 416.920(f). The ALJ found that, pursuant to the VE's testimony, "there are jobs that exist in significant numbers in the national economy" that plaintiff could perform, including office helper, routing clerk, or mail clerk. AR. at 24-25.

## Standard of Review

The scope of this Court's review of the ALJ's decision denying benefits to plaintiff is limited. It is not the function of the Court to determine *de novo* whether plaintiff is disabled. Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam). Rather, so long as a review of the administrative record confirms

22

that "there is substantial evidence supporting the Commissioner's decision," and "the Commissioner applied the correct legal standard," the Commissioner's determination should not be disturbed. Acierno v. Barnhart, 475 F.3d 77, 80—81 (2d Cir.), cert. denied, 551 U.S. 1132 (2007). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Brault, 683 F.3d at 447—48 (internal citation and quotation marks omitted). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (internal quotation marks omitted).

This deferential standard of review does not mean, however, that the Court should simply "rubber stamp" the Commissioner's determination. "Even when a claimant is represented by counsel, it is the well-established rule in our circuit that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009); see also Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) ("Because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative

obligation to develop the administrative record.").   While not every factual conflict in the record need be explicitly reconciled by the ALJ, "crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).   "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."   Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam).   Moreover, "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

## Discussion

**Plaintiff's Contentions**:   Plaintiff strenuously argues that the ALJ erred because substantial evidence exists to prove that he satisfies step three of the five-step evaluation.   See Plaintiff's Motion for Directed Verdict (Docket # 26) at 6.   In support of this,

24

plaintiff notes that the ALJ found he suffered from "severe Hypertension, Heart Disease, Obesity, Asthma with chess [sic] pain and back Pain," and broadly asserts that the Commissioner "failed to show that claimant did not qualify at the third step . . . ." Id. The root of plaintiff's specific dissatisfaction with the ALJ's step three analysis is not immediately apparent from the instant motion, but throughout the course of this litigation he has repeatedly asserted that his hypertension specifically is of such severity that it satisfies step three. See Plaintiff's Reply to Defendant's Pleading (Docket # 22) at 3-4.

Plaintiff's argument is unpersuasive. At step three, an ALJ is tasked with determining whether the medical severity of a claimant's impairment (or impairments) "meets or equals [the severity of] one of the [Social Security Administration's] listings in appendix 1" of the relevant regulations.    20   C.F.R.   §§ 404.1520(a)(4)(iii), 416.920.   The claimant shoulders the burden of satisfying step three.   Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009); see also 20 C.F.R. § 404.1512.   If the claimant presents sufficient evidence to convince the ALJ that their impairment satisfies step three, the claimant is considered automatically disabled and precluded from any substantial gainful activity.   Id.; see also Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000)(holding that satisfying step three creates an "irrebuttable presumption of

25

disability under the regulations"). Understandably, this is a heavy burden; in order to satisfy step three, a claimant's impairment must satisfy _all_ of the criteria in the listing. See Wojciechowski v. Colvin, 967 F.Supp.2d 602, 613 (N.D.N.Y. 2013)("If a claimant's impairment manifests only some of those criteria [in the listing], no matter how severely, the impairment does not qualify." (internal quotations omitted)); 20 C.F.R. §§ 404.1525, 416.925.

Here, a careful review of the evidence in the record supports the ALJ's conclusion that plaintiff does not have an impairment that meets the severity of any listed in the regulations. At step two, the ALJ determined that plaintiff suffered from severe "heart disease, asthma, hypertension, shortness of breath, and obesity." AR. at 21. At step three, the ALJ contemplated, but ultimately rejected, the notion that the severity of plaintiff's cardiovascular impairments met or equaled the severity of impairments in listing 4.00 Cardiovascular System. Id. The cardiovascular listing calls for the ALJ to evaluate hypertension – the impairment that plaintiff posits qualifies him for presumptive disability under step three – based on its effects to specific body systems like the heart, brain, kidneys, or eyes. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.00(H). Thus, in order to be considered presumptively disabled due to hypertension, a claimant also needs to suffer from, for example, chronic heart failure; ischemic heart disease; or chronic and severe

26

vision, renal function, or central nervous system impairments as defined by the regulations.  Id.; see also Ianni v. Barnhart, 403 F.Supp.2d 239, 253 (W.D.N.Y. 2005).  To put it differently, in order for hypertension to satisfy step three, the body systems affected by hypertension must be severely impaired, too.  Id.

As explained in the ALJ's decision, plaintiff's medical records fall short of proving the diagnostic and clinical findings required under the relevant listing.  AR. at 21.  Plaintiff alleges, and the record confirms, that he has chronic (albeit, at times benign, AR. at 372) hypertension, and that the hypertension affects his heart. See Plaintiff's Reply to Defendant's Pleadings (Docket # 22) at 3-4. Assuming arguendo that an individual suffering from what a treating physician has described as "benign" hypertension can be considered totally disabled because of that impairment, the effect that plaintiff's hypertension has on his heart and other body systems is simply not severe enough to qualify him for irrebuttable disability. The medical record indicates that, during the relevant time period, plaintiff's LVH ranged from minimal to moderate; plaintiff's atrial enlargement was mild; and plaintiff's hypertension was - at times - benign.  AR. at 307, 343, 366, 372.  While plaintiff submitted a letter to this Court from Dr. Beecher suggesting that plaintiff suffered from renal issues, the impairment was described as "mild" and, more importantly, the evidence post-dates this matter's

27

relevant time period as described below.  Plaintiff's Request for
Default Judgment (Docket # 18) at 8.    Taken together, these
conditions simply don't meet the categorical listing requirements
for severe cardiovascular heart impairments under the Social
Security Act.  See Ianni, 403 F.Supp.2d at 253 (finding claimant's
hypertension does not meet the listing because claimant had no
history of chronic heart failure; ischemic heart disease; or severe
vision, renal function, or central nervous system impairments, and
claimant could control his hypertension through medication); see
also 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 4.01-4.12.

Finally, although plaintiff has submitted additional evidence
to the Social Security Appeals Council and this Court after the ALJ's
July 5, 2013 decision, the new evidence does not affect this Court's
judgment as to the step three analysis.  With respect to the evidence
submitted to the Appeals Council, that tribunal may consider evidence
that is "new and material" only if it "relate[s] to the period on
or before the ALJ's decision."  Perez v. Chater, 77 F.3d 41, 45 (2d
Cir. 1996).  This Circuit has held "that the new evidence submitted
to the Appeals Council following the ALJ's decision becomes part of
the administrative record for judicial review when the Appeals
Council denies review of the ALJ's decision."  Id. at 45 ("[T]he
administrative record should contain all evidence submitted before
[the Appeals Council's denial], including the new evidence that was

28

not before the ALJ."). However, this Court is not required "to perform any functions performed by an ALJ." Id. at 46. Rather, "[w]hen the Appeals Council denies review after considering new evidence, [this Court must] simply review the entire administrative record, which includes the new evidence, and determine, as in every case, whether there is substantial evidence to support" the ALJ's decision. Id.

In this case, the Appeals Council considered the new evidence, but found that it had "no reason . . . to review the Administrative Law Judge's decision." AR. at 1. The Appeals Council specifically concluded that the new evidence was either duplicative of evidence already on the record or that it applied to plaintiff's health during a period of time that post-dates the ALJ's decision. Id. at 2. After reviewing the additional evidence, this Court agrees.

With respect to the evidence submitted to this Court, the Social Security Act states that a court may require the Commissioner to review new evidence only "upon a showing that [the evidence] is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). As was the case with evidence submitted to the Appeals Council, in order to be material, the evidence proffered to this Court must be relevant to the time period at issue and probative. Adamski v. Barnhart, 404 F.Supp.2d 488, 494 (W.D.N.Y. 2005)(citing Jones v.

Sullivan, 949 F.2d 57,60 (2d Cir. 1991)). Put simply, material evidence is evidence arising after plaintiff's alleged disability onset date but before the ALJ's disability determination. The new evidence plaintiff seeks to have this Court consider here applies to plaintiff's medical status several years after the ALJ rendered her decision. Thus, it cannot be considered when reviewing the disability determination before the Court.

Improper Credibility Determination: Though not persuaded by plaintiff's claim that he satisfied step three of the five-step analysis, the Court's review of the record has nonetheless identified a significant error in the ALJ's evaluation of the evidence that was properly before her. The ALJ found plaintiff's medical impairments could reasonably cause his symptoms, but determined that plaintiff's statements regarding the "intensity, persistence and limiting effects" of his symptoms were not "entirely credible." AR. at 22. Since plaintiff was unrepresented at the hearing, his testimony regarding the "intensity, persistence and limiting effects" of his medical issues was obviously important to his claims, particularly because, as the ALJ noted, "the record contained no treating source statements." AR at 23. To justify her decision questioning the credibility of the plaintiff when he described the intensity and effects of his medical impairments, the ALJ specifically referenced plaintiff's inability to quit smoking and lose weight despite the

30

advice of his treatment providers. AR. at 22-23. As explained below, this was error.

Smoking: With respect to his smoking, the ALJ found that plaintiff "is a habitual smoker despite treatment advice to quit, which does not bolster the credibility of his subjective allegations." AR. At 22. The ALJ went on to find that the plaintiff's "smoking suggests the existence of at least some funds that could contribute to the cost of his medical care." Id.

It is unclear how plaintiff's failure to quit undermines the intensity, persistence, or limiting effects of his symptoms. Indeed, courts in the Second Circuit recognize that, given its addictive nature, "the failure to quit [smoking] is as likely attributable to factors unrelated to the effect of smoking on a person's health." Riechl v. Barnhart, No. 02-CV-6169, 2003 WL 21730126, at *13 (W.D.N.Y. June 3, 2003)(quoting Shramek v. Apfel, 226 F.3d 809, 813 (7th Cir. 2000)). In Riechl, the court recognized that one does not "need to look far to see persons with emphysema or lung cancer – directly caused by smoking – who continue to smoke, not because they do not suffer gravely from the disease, but because other factors such as the addictive nature of the products impacts their ability to stop." Id. (quoting Shramek, 226 F.3d at 813). As such, a failure to quit smoking makes for "an unreliable basis on which to rest a credibility determination." Id. (quoting Shramek,

31

226 F.3d at 813); see also Brown v. Colvin, No. 14-CV-725, 2015 WL 4488670, at *15 (N.D.N.Y. July 22, 2015)(finding that "the ALJ's rejection of plaintiff's credibility based on plaintiff's failure to quit smoking" constituted error); Goff v. Astrue, 993 F.Supp.2d 114, 128 (W.D.N.Y. 2012); Lavalle v. Astrue, 759 F.Supp.2d 238, 239 (D.Conn. 2011) ("[T]o discount the severity of [plaintiff's disability] due to his own failure to heed physicians' advice to stop smoking is unsound . . . .").

Moreover, to the extent that an ALJ can properly use a claimant's failure to quit smoking to question their credibility, the ALJ must: (1) explain with medical evidence how smoking cessation would affect plaintiff's residual functional capacity; and (2) ask for and consider explanations for plaintiff's failure to quit. See Goff, 993 F.Supp.2d at 128-29; see also Riechl, 2003 WL 21730126, at *13 (rejecting the ALJ's credibility determination in part because the ALJ failed to "cite any evidence in the record indicating that plaintiff's condition would improve or that her ability to work would increase if she were to stop smoking" (citing Shramek, 226 F.3d at 812-13)). As the regulations make clear, a failure to follow prescribed treatment can be used to question a claimant's credibility only if the "treatment can restore [claimant's] ability to work," and "[i]f [the claimant] do[es] not follow the prescribed treatment without a good reason . . . ." 20 C.F.R. § 404.1530(a)-(b); see also

SSR 96-7p ("However, the adjudicator must not draw any inferences about an individual's symptoms . . . without first considering any explanations that the individual may provide . . . that may explain infrequent or irregular medical visits or failure to seek medical treatment."). If an ALJ does not properly apply this standard and "evidences no consideration of plaintiff's efforts to quit smoking or the explanations contained in the record regarding [their] difficulties in that regard," remand is required. Goff, 993 F.Supp.2d at 129.

Here, not only did the ALJ improperly rely on plaintiff's inability to quit smoking to undermine his credibility, but she failed to explain her reasoning for doing so. AR. at 22-23. As noted above, the addictive nature of cigarettes renders a failure to quit smoking "an unreliable basis on which to rest a credibility determination." Riechl, 2003 WL 21730126, at *13 (quoting Shramek, 226 F.3d at 813). Moreover, the record reflects that plaintiff attempted to quit smoking on multiple occasions, and even asked his physician for a nicotine replacement to curb his addiction. AR. at 312, 317. At his hearing, plaintiff confirmed this, saying that he was "working" on quitting, but the ALJ never asked plaintiff to provide reasons for his inability to stop. AR. at 40-41. In short, the ALJ's decision improperly relied on plaintiff's smoking to question his credibility, and offered no explanation – and made no

effort to uncover an explanation - as to how smoking cessation would improve plaintiff's RFC or why plaintiff was unable to quit.

Obesity: The ALJ also suggested that plaintiff's failure to lose weight somehow undercuts the credibility of his allegations concerning the intensity, persistence, and limiting effects of his symptoms.   AR. at 22-23.   Again, the ALJ's reasoning is problematic.

To start, ample case law in other circuits suggests that, much like habitual smokers, obese claimants trying to lose weight may not necessarily be grappling with a remediable condition.   See McCall v. Bowen, 846 F.2d 1317, 1319 (11th Cir. 1988) ("A physician's recommendation to lose weight does not necessarily constitute a prescribed course of treatment, nor does a claimant's failure to accomplish the recommended change constitute a refusal to undertake such treatment."); see also Johnson v. Secretary of Health and Human Services, 794 F.2d 1106, 1113 (6th Cir. 1986) ("[I]t is impermissible, however, to presume that obesity can be remedied. . . . [P]hysicians' recommendations to lose weight do not necessarily constitute a prescribed course of treatment, nor does a claimant's failure to accomplish the recommended change constitute a refusal to undertake treatment."); Scott v. Heckler, 770 F.2d 482, 486-87 (5th Cir. 1985) ("Significant weight loss is indeed difficult even for the iron willed. For the less determined, who suffer from other painful and debilitating impairments that restrict movement, and no doubt sap

34

the resolve for self-improvement, such a significant loss of weight may be impossible."); Stone v. Harris, 657 F.2d 210, 212 (8th Cir. 1981)(remanding for failure to show that claimant's obesity was reasonably remediable). Obesity, like alcoholism, is in a class of impairments that, "although initially self-inflicted, may become diseases that either contribute to an overall disability or are of themselves disabling." Scott, 770 F.2d at 487. Thus, conclusory determinations that a claimant has not complied with treatment supported by plaintiff's obesity itself are insufficient to use in credibility assessments. See id.; see also McCall, 846 F.2d at 1319. In fact, it has been held by a judge in this district that, in order for an ALJ to discount a claimant's credibility based on a failure to lose weight, the claimant's treating physician must affirmatively state that the claimant had a prescribed diet or was refusing to comply with one. See Dowd v. Comm'r of Soc. Sec., No. 12-CV-6244, 2013 WL 3475479, at *12 (W.D.N.Y. July 10, 2013)(Siragusa, J.)(rejecting a negative credibility assessment where the treating physician "did not specifically state either that [the physician] had prescribed a diet, or that plaintiff was non-compliant with such prescription").

In the instant case, the ALJ's conclusion regarding plaintiff's alleged noncompliance with his physicians' diet advice appears to stem solely from plaintiff's seventeen pound weight gain between

35

August 2012 and June 2013.  AR. at 23.  The ALJ's decision provides

no further information concerning plaintiff's prescribed diet plans

or his failure to comply with them.  This Court's review of the record

reveals treatment non-compliance only insofar as plaintiff resisted

taking medication that gave him headaches and ate a "salty" breakfast

once, AR. at 322, 359, but nothing specifically concerning a

prescribed diet regimen.  Though plaintiff failed to bring a food

log to initial diet and exercise consultations, the issue - based

on the record developed below - appears to have been resolved.  AR.

at 378, 380, 382.  Accordingly, the ALJ's decision lacks the proper

support from evidence in the record to effectively evaluate

plaintiff's alleged dietary failures in the face of his complex and

potentially debilitating comorbid impairments.

The Need for Remand:  I have considered whether the above errors

can be considered harmless in light of the totality of the record

and conclude that remand is necessary.  Based on the evidence in the

record, the Court cannot say that the ALJ's errors were

inconsequential to her ultimate determination that plaintiff did not

qualify for benefits.  In many cases, an "ALJ's assessment of a

claimant's ability to work will depend heavily on the credibility

of [his] statements concerning the 'intensity, persistence and

limiting effects' of [his] symptoms."  Bjornson v. Astrue, 671 F.3d

640, 645 (7th Cir. 2012).  Here, the ALJ obviously had doubts about

36

plaintiff's credibility which were important to her assessment of plaintiff's ability to engage in competitive employment. Accordingly, the ALJ was required to provide legally sufficient reasons for discrediting plaintiff's testimony. Where the reasons given are legally improper, and where crediting plaintiff's allegations concerning the intensity, persistence, and limiting effects of his symptoms might reasonably result in a different outcome, remand is necessary to provide plaintiff due process and a fair hearing.

## Conclusion

The Court notes that plaintiff previously was represented by counsel (Docket #28) and for reasons that remain sealed on the docket plaintiff decided to proceed pro se. See Docket #33. Although the Court has determined that the ALJ erred and remand is necessary, it was not for the reasons argued by plaintiff in his motion for "default judgment" or his motion for a "directed verdict." Social Security disability is an extremely complex area of law for even experienced judges and lawyers to understand and navigate. Since the hearing before the ALJ, plaintiff's treating physician has opined that plaintiff is unable to engage in competitive employment. Although plaintiff may continue to represent himself, the assistance of an attorney may help him determine whether or how the opinion of his

37

treating physician can or should be utilized in further proceedings.

In the meantime, and for the reasons discussed above, this Court finds that the ALJ erred in assessing plaintiff's credibility and this error was not harmless.   Therefore, the Commissioner's motion for judgment on the pleadings (Docket # 20) is **denied**, and plaintiff's motion for directed verdict (Docket # 26) is **granted** only insofar as to remand this matter back to the Commissioner for further proceedings consistent with the findings discussed above.

JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:      January 12, 2016
            Rochester, New York

38